# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|                      |     |                         |
|----------------------|-----|-------------------------|
| STATE OF DELAWARE    | )   |                         |
|                      | )   |                         |
| v.                   | )   | I.D. No. 1505023582A    |
|                      | )   |                         |
| MARSHALL BROWN,      | )   |                         |
|                      | )   |                         |
| Defendant.           | )   |                         |

Submitted: September 11, 2019
Decided: October 31, 2019

*Upon Defendant's Amended Motion for Postconviction Relief,*

**DENIED.**

## **ORDER**

Zachary Rosen, Esquire, Deputy Attorney General, Department of Justice, 820 North French Street, Wilmington, DE 19801, Attorney for the State.

Christopher S. Koyste, Esquire, Law Office of Christopher S. Koyste LLC, 709 Brandywine Blvd., Wilmington, DE 19809, Attorney for Defendant Marshall Brown.

**WHARTON, J.**

This 31st day of October, 2019, upon consideration of Defendant Marshall Brown's ("Brown") timely Amended Motion for Postconviction Relief ("AMPCR),[1] the State's Response,[2] Brown's Reply,[3] and the record in this matter, it appears to the Court that:

1. Brown was indicted by the Grand Jury on the charges of Home Invasion, two counts of Assault First Degree, Reckless Endangering First Degree, three counts of Robbery First Degree, eight counts of Possession of a Firearm During the Commission of a Felony, eight counts of Wearing a Disguise During the Commission of a Felony, Conspiracy Second degree, endangering the Welfare of a Child, and Possession of a Firearm by a Person Prohibited.[4] Brown's first trial ended in a mistrial when the jury was unable to reach a unanimous verdict.[5] At his second trial, Brown was convicted of all charges except the Possession of a Firearm by a Person Prohibited charge, which had been severed for trial and as to which the State entered a *nolle prosequi* after the verdict.[6] Prior to sentencing, the State moved to have Brown declared a habitual offender and sentenced as one on all felony charges for which he was convicted.[7] After declaring Brown a habitual offender, the Court

---

[1] D.I. 95.
[2] D.I. 93.
[3] D.I. 94.
[4] D.I. 3.
[5] D.I. 34.
[6] D.I. 60.
[7] D.I. 63.

2

sentenced him to life imprisonment plus 388 years.[8] Brown appealed to the Delaware Supreme Court. On appeal, he raised a single issue: whether the observation of Brown by two witnesses at his first trial was the equivalent of an impermissibly suggestive pretrial identification procedure.[9] His appeal was unsuccessful and his convictions were affirmed.[10] Brown filed timely *pro se* motions for postconviction relief and appointment of counsel.[11] Counsel was appointed, and has submitted an Amended Motion for Postconviction Relief.[12]

2.      In his AMPCR, Brown presses a single claim of ineffective assistance of counsel.[13] He alleges that his appellate attorney was constitutionally ineffective for failing to appeal the trial court's denial of his motion for judgment of acquittal ("MJA").[14]

3.      Before addressing the merits of a defendant's motion for postconviction relief, the Court must first apply the procedural bars of Superior Court Criminal Rule 61(i).[15] If a procedural bar exists, then the Court will not consider the merits of the postconviction claim.[16]

---

[8] D.I. 66.
[9] *Brown v. State,* 2018 WL 1313036 (Del. 2018).
[10] *Id.*
[11] D.I. 80, 83.
[12] D.I. 95.
[13] *Id.*
[14] *Id.*
[15] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[16] *Id.*

4. Under Delaware Superior Court Rules of Criminal Procedure, a motion for postconviction relief can be barred for time limitations, repetitive motions, procedural defaults, and former adjudications. A motion exceeds time limitations if it is filed more than one year after the conviction becomes final or if it asserts a newly recognized, retroactively applied right more than one year after it was first recognized.[17] A second or subsequent motion is repetitive and therefore barred.[18] The Court considers a repetitive motion only if the movant was convicted at trial and the motion pleads with particularity either: (1) actual innocence;[19] or (2) the application of a newly recognized, retroactively applied rule of constitutional law rendering the conviction invalid.[20] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[21] Grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[22]

---

[17] Super. Ct. Crim. R. 61(i)(1).
[18] Super. Ct. Crim. R. 61(i)(2).
[19] Super. Ct. Crim. R. 61(d)(2)(i).
[20] Super. Ct. Crim. R. 61(d)(2)(ii).
[21] Super. Ct. Crim. R. 61(i)(3).
[22] Super. Ct. Crim. R. 61(i)(4).

5. This AMPCR is a timely first motion for postconviction relief, alleging ineffective assistance of counsel. Accordingly, the Court will consider the motion on its merits.

6. To succeed on an ineffective assistance of counsel claim, a claimant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficiencies prejudiced the claimant by depriving him or her of a fair trial with reliable results.[23] To prove counsel's deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness.[24] Moreover, a defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.[25] "[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[26] A successful Sixth Amendment claim of ineffective assistance of counsel requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[27] An inmate must satisfy the proof requirements of both prongs to succeed on an ineffective assistance of counsel claim. Failure to do so on either

---

[23] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).
[24] *Id.* at 667-68.
[25] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).
[26] *Strickland*, 446 U.S. at 689.
[27] *Id.* at 694.

5

prong will doom the claim and the Court need not address the other.[28]  In the appellate context, "[t]he [d]efendant must first show that his counsel was objectively unreasonable in failing to find arguable issues on appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."[29] Appellate counsel "need not (and should not) raise every nonfrivilous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."[30] Nonetheless, it is "still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."[31]  A defendant faces a tougher burden of "showing that a particular nonfrivilous issue was clearly stronger than issues that counsel did present" where appellate counsel filed a merits brief, than in the case where appellate counsel filed a no merit brief.[32]  Further, Brown must still show prejudice, "That is, [the defendant] must show a reasonable probability that, but for his counsel's unreasonable failure [to raise a clearly stronger issue], he would have prevailed on his appeal."[33]  Here, Brown cannot demonstrate either that counsel's performance

---

[28] *Strickland,* 466 U.S. at 697; *Ploof v. State,* 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.").
[29] *Neal v. State,* 80 A.3d 935, 946 (Del. 2013) (quoting *Smith v. Robbins,* 528 U.S. 259, 285 (2000)).
[30] *Id.* (citing *Smith,* 528 U.S. at 288).
[31] *Id.*
[32] *Id.*
[33] *Id.* at 947 (quoting *Smith,* 528 U.S. 285).

6

was deficient in that the issue that was not presented was "clearly stronger" than the argument actually presented on appeal, or prejudice.

7. At the conclusion of the State's case at trial, trial counsel[34] moved for judgment of acquittal.[35] Trial counsel argued that there was insufficient evidence in the record on the issue of identification from which a jury could convict the defendant.[36] Specifically, counsel argued that the identification made by one witness, who testified that she would never forget the Brown's eyes, was "inherently incredible."[37] Counsel acknowledged that there was circumstantial evidence suggesting that Brown was present at the crime scene two weeks before the incident as well as circumstantial evidence connecting him to items left at the crime scene, but argued there was insufficient evidence to place him at the scene when the crimes occurred.[38] The State responded that a witness positively identified Brown as being present at the scene two weeks before the incident and that Brown's fingerprint was found at the scene.[39] The State also referenced the witness who said she would never forget Brown's eyes.[40]

8. Some understanding of the evidence presented at trial is necessary to understand the shorthand references used by the parties and the Court in addressing

---

[34] Different counsel represented Brown on appeal.
[35] Trial Tr. March 30, 2017, at 112-14.
[36] *Id.*, at 113.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*

7

the MJA. That evidence is chilling. On May 26, 2015, Karen Fahey ("Karen") was awakened by bells ringing on the back door of the Townsend, Delaware home she shared with her mother, her daughter, her daughter's boyfriend, and her two grandchildren.[41] When she turned on a light, she was alarmed to see someone dressed all in black in her backyard.[42] She yelled for everyone to get up and for her daughter to call 9-1-1.[43] Grabbing her gun from her bedroom, she ran back to her kitchen.[44] She heard pounding on the door, the door bursting open, and saw somebody jump into the house.[45] She took a shot and the intruders opened fire, hitting her in the leg.[46] After her gun jammed, she grabbed her granddaughter, ran back into the bedroom and threw a blanket over her.[47] Someone ran into her room, grabbing her, pounding her head down, and telling her to stay down while yelling, "Police, police, get down."[48] Karen could hear her daughter in the other room yelling, "Give me my baby."[49] After the intruder had gone into and out of the bedroom screaming, "Give me the money. Give me the money," somebody yelled that the police were coming, and all of the intruders fled.[50] Karen described the

---

[41] Tr., Mar. 29, 2017 at 55, 56.
[42] *Id.* at 57.
[43] *Id.*
[44] *Id.* at 57, 58.
[45] *Id.*
[46] *Id.*
[47] *Id.* at 59.
[48] *Id.*
[49] *Id.*
[50] *Id.* at 60, 61.

intruders as wearing all black clothing with "POLICE" written across their shirts and wearing masks and gloves.[51]

9. Stacie Fahey ("Stacie") was living in the home as well. She lived there with her mother, Karen, her grandmother, her boyfriend and their two children.[52] On the night of the home invasion, she was awakened by her mother screaming, "They're here, they're here, call 9-1-1."[53] She called 9-1-1 from her cell phone and threw the phone into her desk in the bedroom.[54] She and her boyfriend tried to barricade the bedroom door with the desk, but the intruders broke down the door, dragged her boyfriend out of a closet, and took him into the kitchen.[55] There, they beat him while demanding money.[56] Stacie was sitting on the bed, tightly holding onto her one-year-old son when one of the men came into the bedroom and squatted down on his knees to her level.[57] He put a gun to her head and demanded money.[58] The man then took her son from her, grabbed him by the leg, hung him upside down, put a gun to his head, and said he was going to kill her son if she did not give him money.[59] Eventually, the man threw her baby on the bed and fled with the others.[60]

---

[51] *Id.* at 63.
[52] *Id.* 86.
[53] *Id.*
[54] *Id.* 87, 88.
[55] *Id.*
[56] *Id.* at 75, 76.
[57] *Id.* at 90.
[58] *Id.*
[59] *Id.*
[60] *Id.* 91.

Stacie testified that she got a good look at the eyes of the man who crouched in front of her and took her baby away from her, playing the look she had of his eyes back in her head every day.[61] She testified that she looked at the man's eyes from about the distance between her and the microphone on the witness stand.[62] She said the Brown's eyes looked like that man's eyes.[63] The incident ended when someone yelled that the police were coming and everyone fled the house.[64]

10. When police arrived and began looking for evidence, they found a backpack, which contained a roll of duct tape and a pink stun gun, on the side of the driveway.[65] A forensic latent print examiner later matched a thumbprint found on the duct tape to Brown.[66] DNA collected from the tightening strap of the backpack was consistent with being from a mixture of at least three individuals, including Brown, and excluding Karen, Stacie, and Stacie's boyfriend.[67]

11. Helen McKamey lived in the same house as her daughter, Karen, and her granddaughter, Stacie.[68] On May 14th, she said three men in a car came down the lane leading from the road to her house.[69] The passenger asked if she had any

---

[61] *Id.* at 91, 92
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] Tr., Mar. 30, 2017 at 98, 99.
[66] *Id.* at 45, 46.
[67] *Id.* at 68.
[68] *Id.* at 114.
[69] *Id.* at 116, 117.

hay for sale, despite there being no signs indicating hay for sale.[70] At trial, McKamey positively identified Brown as being the driver of the vehicle.[71] Karen was home with her mother when this incident occurred.[72] She observed her mother outside talking to some people in a blue Lincoln.[73] Because she thought the encounter was strange, she got the vehicle's license plate number.[74] The license plate came back to a vehicle registered to Jennifer Brown of 2509 North Washington Street in Wilmington.[75] Brown listed the same address.[76] Jennifer Brown is Brown's mother.[77]

12. Having heard the evidence outlined above, and viewing that evidence in the light most favorable to the State, the Court denied Brown's MJA.[78] Specifically, the Court cited Brown's presence at the crime scene 12 days before the crime and his fingerprints at the scene on an item in the backpack.[79]

13. Brown's AMPCR raises a single issue of ineffective assistance of counsel. He alleges that his appellate counsel was ineffective in failing to appeal the trial court's denial of his MJA.[80] The only issue raised on appeal argued that

---

[70] *Id.* at 117, 118.
[71] *Id.*
[72] Tr., Mar. 29, 2017 at 64.
[73] *Id.*
[74] *Id.* 64, 65.
[75] *Id.* at 101.
[76] *Id.*
[77] *Id.*
[78] *Id.* at 114.
[79] *Id.*
[80] D.I.

courtroom identifications of Brown were preceded by unduly suggestive *de facto* show up identifications at his previous trial, and should have been excluded from his second trial.[81] In an attempt to satisfy *Strickland's* performance prong, Brown argues that failure to appeal the denial of the MJA was objectively unreasonable in its own right, but was "particularly detrimental" because raising that issue would have given additional credence to the issue that appellate counsel did raise.[82] On the prejudice prong Brown argues that he was prejudiced by appellate counsel's failure to raise the denial of the MJA because that issue was stronger than the one raised, was inextricably intertwined with the raised issue, and would have presented a much stronger appeal had both claims been raised.[83] In response, the State recites much of the above referenced evidence. It contends that the physical evidence corroborates the witnesses' identifications, and as a result, given the standard for resolving such motions, the trial court properly denied the MJA.[84] Since the trial court correctly denied the motion, the State argues that Brown fails to establish either performance deficiency or prejudice.[85] Furthermore, according to the State, in focusing exclusively on evidence placing Brown at the scene of the crime, the AMPCR fails to address his liability as an accomplice, which did not depend on his

[81] *See, Brown v. State,* 2018 WL 1313036 (Del. 2018).
[82] D.I. ** at 17, 18.
[83] *Id.* 19.
[84] D.I. 93 at 11, 12.
[85] *Id.* at 14, 15.

presence at the scene.[86] In reply, Brown maintains that, even under an accomplice liability theory, there was insufficient evidence that Brown intended the crimes that were eventually committed.[87]

14. In order to succeed with this AMPCR, Brown must show both that the MJA issue was "clearly stronger" than the one raised, and, but for the failure to raise that issue, there was a "reasonable probability" that he would have been successful on appeal. Thus, in considering the AMPCR, the Court must evaluate the strength of the MJA issue relative to both the issue appellate counsel did raise, and to Brown's overall prospects for success on appeal.

15. The time honored approach a trial court takes in addressing a MJA is to consider the evidence, together with all legitimate inferences from the evidence in the light most favorable to the State.[88] It is only where the State has offered insufficient evidence to sustain a verdict of guilt that a MJA will be granted.[89] Denials of MJAs are reviewed *de novo* by the Delaware Supreme Court.[90] On *de novo* review the Supreme Court replicates the approach of the Superior Court. It determines "whether any rational trier of fact, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the State,

---

[86] *Id.* at 13, 14.

[87] D. I. 94 at 11.

[88] *State v. Biter,* 119 A.2d 894 (Del. Super. 1955); *Vouras v. State,* 452 A.2d 1165 Del. 1982).

[89] *Id.*

[90] *Cushner v. State,* 2019 WL 3543171 at *2 (Del. Aug. 5, 2019).

13

could find the defendant guilty beyond a reasonable doubt of all of the elements of the crime."[91]

16. A defendant has a difficult task when advancing a MJA at trial, and perhaps an even more difficult one on appeal. The playing field tilts substantially in favor of the State. The question for the court is whether *any* rational trier of fact *could* find the defendant guilty when it views, not only the evidence, but also *all reasonable inferences* drawn therefrom in the light *most favorable* to the State. Obviously, this standard reflects a strong preference for juries to decide cases. It is no wonder then that MJAs rarely succeed at trial. Successful appeals when those motions are denied are rarer still.

17. The Court acknowledged that unleveled playing field when it denied the MJA. Brown's thumbprint was on a roll of duct tape left behind by the intruders when the home invasion occurred. The duct tape was in a backpack along with a stun gun. These facts come directly from the evidence and need no inferential help to establish. That the intruders intended to use these items in facilitating the crimes is an obvious inference without resorting to the need to view it in the light most favorable to the State. Further, Brown's presence at the crime scene 12 days earlier is established with scant resort to any preferential inference. The license plate on the car the visitors drove that day proved that the car belonged to Brown's mother. The car was registered to an address in Wilmington that Brown also listed as his

---

[91] *Id.*

14

address, and Karen identified Brown as one of the occupants. Karen believed the incident odd. The inquiry about hay for sale made no sense. There was no signage anywhere advertising hay for sale, and the visitors' vehicle – a Lincoln – seemed unsuitable for hauling hay. A rational trier of fact easily could infer that the purpose of the encounter on May 14th was reconnaissance. The Court remains convinced that a rational jury could infer from Brown's reconnaissance of the victims' residence together with his thumbprint on an object left at the crime scene that Brown was present at the scene.[92]

18.     On appeal, Brown's counsel unsuccessfully challenged the in-court identifications of Brown by Karen and Brown's eyes by Stacie. He argued that those identifications were impermissibly suggestive due to the witnesses' observations of Brown during his first trial. The Court does not perceive either the MJA issue or the one raised on appeal as being particularly strong. When balancing the two, the Court cannot say Brown's issue is "clearly stronger." Both were unlikely to prevail.

19.     In his AMPCR Brown focuses his argument on an alleged insufficiency of evidence to place Brown at the scene of the crime when it occurred, just as he did

---

[92] Brown relies on *Monroe v. State*, 652 A.2d 560 (Del. 1995) for the proposition that a lone fingerprint is insufficient to create an inference of a defendant's presence at a crime scene so as to sustain a defendant's conviction. The circumstances here are materially different, making *Monroe* inapposite. In *Monroe,* the defendant's fingerprint was found in a place accessible to the public. Here, Brown's thumbprint was found on a roll of duct tape inside a backpack left in a place where Brown had no license to be. Obviously, the probative value of the thumbprint here is far greater than in *Monroe.*

15

at trial. Neither side addressed the MJA at trial in the context of accomplice liability, nor did the Court. In response to the AMPCR, the State does present an argument based on accomplice liability. It is unknown whether the Supreme Court would have entertained that argument on appeal, since the State did not raise it at trial and this Court did not address it in its ruling. Nevertheless, the Court finds that Brown's argument weakens when it considers his possible liability as an accomplice, given that Brown's presence at the scene was not required for liability under that theory.[93] It is no great stretch to conclude Brown reconnoitered the target. A rational trier of fact also could easily determine that Brown supplied the duct tape on which his thumbprint was found for the purpose of restraining the victims. A rational trier of fact further reasonably could infer that Brown intended that his confederates would commit a home invasion and related crimes, and, having supplied an instrumentality of restraint, that he reasonably foresaw that violent crimes would be committed against the victims. In fact, home invasion itself is a violent crime and the Court can fathom no other purpose for committing it except to commit other violent crimes.

20.     Finally, Brown argues that his appeal would have been strengthen by including the MJA issue since it would have acted synergistically with the issue that

---

[93] In fact, the Court instructed the jury on accomplice liability. Tr., Mar. 30, 2017 at 193-96. In response to a note, the Court instructed the jury, "Physical presence at the scene of a crime is not a requirement of accomplice liability." Tr., Mar. 31, 2017 at 11. While the note made it plain that some jurors were considering Brown's guilt as an accomplice, it is not known how many, if any, jurors settled on that theory in finding Brown guilty.

was raised to highlight the weakness of the State's case. The Court disagrees. No doubt, the Supreme Court was fully aware of the evidence the State presented at trial. In this Court's view, to the extent that the MJA issue would have had any effect at all, that effect was just as likely to have been corrosive, rather than synergistic. Adding the MJA issue might well have served only to emphasize that a rational jury, viewing all of the evidence without any preferential inferences, did find Brown guilty beyond a reasonable doubt. The Court finds that Brown has not established that the MJA issue was "clearly stronger" than the issue presented on appeal, and accordingly, he has not established that appellate counsel's performance was deficient.

21.    The Court has already expressed it views on the strength of the MJA issue in discussing *Strickland's* performance prong. Because it finds the MJA issue to be unpersuasive, the Court finds that including it on appeal would not have created a "reasonable probability" of success, whether standing alone or in conjunction with the issue raised by appellate counsel.

**THEREFORE,** the Brown's Amended Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

_____
Ferris W. Wharton, J.

17